UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| DARRELL DEWAYNE CARTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:23-cv-00386-JRS-MKK |
| | ) | |
| WEXFORD HEALTH SERVICES, | ) | |
| NAVEEN RAJOLI, | ) | |
| SAMUEL BYRD, | ) | |
| SARA BEDWELL, | ) | |
| KIMBERLY HOBSON, | ) | |
| BARBARA RIGGS, | ) | |
| S. CRITCHFIELD, | ) | |
| FRANK VANIHEL, | ) | |
| MICHAEL ELLIS, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff Darrell Carter, pro se, alleges in this 42 U.S.C. § 1983 lawsuit that Defendants violated his Eighth Amendment rights by displaying deliberate indifference towards internal hemorrhoids and rectal pain. Mr. Carter sues two groups of Defendants. The "Medical Defendants" are Dr. Naveen Rajoli, Dr. Samuel Byrd, Sara Bedwell, Kimberly Hobson, Barbara Riggs, and Wexford of Indiana, LLC ("Wexford"). The "IDOC Defendants" are Shelby Crichfield, Frank Vanihel, and Michael Ellis.[1] Both groups of Defendants have moved for summary judgment. For the reasons discussed below, the IDOC Defendants' motion for summary judgment, dkt. [64], is

---

[1] Shelby Crichfield is identified as "Shelby Critchfield" by all parties. The Court uses the spelling "Crichfield" because that is how this Defendant's name is spelled in the records where she signs her name. *See, e.g.*, dkt. 79-1 at 16.

**GRANTED**. The Medical Defendants' joint motion for summary judgment, dkt. [60], is **DENIED** as to Dr. Rajoli and Dr. Byrd and **GRANTED** as to the remaining Medical Defendants.

## I.
## Motion to Strike

Mr. Carter filed his response to both Defendants' motions for summary judgment on June 24, 2025. Dkt. 79. The Defendants timely filed their reply briefs on July 1 and July 8. Dkts. 81, 82. After the Court extended Mr. Carter's deadline to file a surreply, he did so on August 8. Dkt. 87.[2] The Medical Defendants then filed a motion to strike Mr. Carter's surreply, dkt. 88, and the IDOC Defendants moved to join this motion, dkt. 91. The motion to strike argues that Mr. Carter's surreply is improper under Local Rule 56-1(d) because the Defendants' replies do not object to the admissibility of Mr. Carter's evidence or cite any new evidence. Dkt. 88 at 2. *See* S.D. Ind. L. R. 56-1(d) ("A party opposing a summary judgment motion may file a surreply brief only if the movant cites new evidence in the reply or objects to the admissibility of the evidence cited in the response."). Mr. Carter's response appears to argue that the Medical Defendants attacked the admissibility of his evidence by claiming that he lied about his weight loss and whether Nurse Barbara Riggs gave him suppositories. Dkt. 92. The Court construes the Defendants' discussion of his weight, however, as an attack on Mr. Carter's credibility—not as an argument that the evidence

---

[2] The Court's order granting the extension of time stated: "This Order does not constitute a finding that Plaintiff is permitted to file a surreply under Local Rule 56-1 or that any surreply he might file would comply with that rule." Dkt. 85.

concerning his weight is inadmissible.[3] The Defendants' replies do not argue that any of Mr. Carter's designated evidence is inadmissible.

Furthermore, Mr. Carter's surreply argues that the Medical Defendants' citation of Dr. Rajoli's affidavit is "new evidence." Dkt. 87 at 1. However, the Medical Defendants designated Dr. Rajoli's affidavit as evidence in support of their motion for summary judgment, dkt. 61-5, and discussed Dr. Rajoli's assessment of Mr. Carter's weight in their initial brief, *see* dkt. 62 at 5, 17. The same is true for Mr. Carter's claim that the Medical Defendants cited the prescription for "hemorrhoidal suppositories" for the first time in their reply. *See* dkt. 89 at 2–3. Dr. Rajoli's affidavit clearly states that Mr. Carter reported a growth in September 2021 "despite use of hemorrhoidal suppositories already provided to him by Defendant Barbara Riggs." Dkt. 61-5 ¶ 23. The rest of Mr. Carter's surreply does not attempt to address new evidence. Instead, it argues against both sets of Defendants' reply briefs.

In sum, Defendants' replies do not attack the admissibility of Mr. Carter's evidence, nor do they cite any new evidence. Thus, Mr. Carter's surreply violates Local Rule 56-1(d). The Court **GRANTS** the Defendants' motion to strike the surreply, dkts. [88], [91]. The **clerk is directed** to strike the surreply at Docket No. [87].

## II.
## Summary Judgment Standard of Review

A motion for summary judgment asks the Court to find that trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable

---

[3] When reviewing a motion for summary judgment, the Court cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the jury. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).

to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

### III.
### Factual Background

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to Mr. Carter and draws all reasonable inferences in his favor. *Khungar*, 985 F.3d at 572–73.

#### A. Background and Parties

##### i. The Plaintiff

**Darrell Carter** has suffered from painful hemorrhoids and rectal issues since at least 2012. Dkt. 79-1 at 3 ¶ 2 (Carter Affidavit). On September 13, 2012, a colonoscopy at St. Mary's Medical Center revealed that Mr. Carter had "'enlarged internal hemorrhoids with some friability, but no

bleeding." Dkt. 61-1 at 1.[4] Mr. Carter's physician, Dr. Syam Chilukuri recommended a high fiber diet and repeating a colonoscopy within five years due to his family history of polyps. *Id.* at 2. Dr. Chilukuri stated, "[i]f [Mr. Carter] continues to have symptomatic hemorrhoids, then banding likely would be the next approach to controlling this." *Id.*

By March of 2018, Mr. Carter was incarcerated at Wabash Valley Correctional Facility ("Wabash Valley"). At this point, Mr. Carter began seeking medical treatment for hemorrhoids, abdominal pain, and rectal bleeding. Dkt. 79-1 at 3 ¶ 3. Mr. Carter continuously submitted Healthcare Request Forms ("HCRFs"), complaining about worsening rectal pain, weight loss, hemorrhoids, and bloody stool. Some of the Medical Defendants assessed Mr. Carter's symptoms at various times from approximately 2018 until 2022, prescribing conservative treatments such as topical ointment, suppositories, and Sitz Baths with Epsom salts. Beginning in 2021, Mr. Carter submitted several grievances to the IDOC Defendants, complaining about the delay in treatment, to no avail. In April of 2022, Mr. Carter communicated with an attorney from the American Civil Liberties Union ("ACLU") about Wabash Valley's delay in treating him and the attorney contacted IDOC attorneys. Dkt. 79 at 13. Finally, in July of 2022, Dr. Byrd referred Mr. Carter to an offsite gastroenterologist, who performed a colonoscopy. After the colonoscopy revealed several hemorrhoids, Dr. Byrd referred Mr. Carter to a surgeon who surgically removed the hemorrhoids in February of 2023. Since then, Mr. Carter's symptoms have dissipated. Dkt. 79-1 at 6 ¶ 19.

### ii. The Medical Defendants

- **Wexford** served as the IDOC's healthcare services provider until June 30, 2021. Dkt. 10 at 4. Prior to this date, the Medical Defendants were employed by Wexford. Centurion Health of Indiana, LLC ("Centurion"), who is not a defendant, began providing healthcare services

---

[4] Citations are to the page numbers from the pdf document.

to the IDOC on July 1, 2021. *Id*. After that date, Centurion employed the Medical Defendants.

- **Dr. Naveen Rajoli**, MD ("Dr. Rajoli"), is a licensed physician who treated Mr. Carter during his incarceration at Wabash Valley until December of 2021. Dkt. 61-5 ¶¶ 4–5, 29 (Rajoli Affidavit).

- **Dr. Samuel Byrd**, MD ("Dr. Byrd"), is a licensed physician who treated Mr. Carter during his incarceration at Wabash Valley. Dkt. 61-6 ¶¶ 4–5 (Byrd Affidavit).

- **Sara Bedwell** was the Health Services Administrator at Wabash Valley in 2022 ("HSA Bedwell"). *Id.*, ¶ 36. She is not a physician, and she was not responsible for reviewing or assessing the physicians' treatment decisions. *Id.*

- **Kimberly Hobson**, RN, was the Health Services Administrator at Wabash Valley in 2021 ("HSA Hobson"). Dkt. 61-5 ¶¶ 32–33. HSA Hobson served in an administrative role and was not responsible for clinical treatment. *Id.*

- **Barbara Riggs**, RN, ("Nurse Riggs") was Director of Nursing at Wabash Valley during the events at issue in this lawsuit.

### iii. The IDOC Defendants

- **Shelby Crichfield** was a grievance specialist at Wabash Valley during the events at issue in this lawsuit.

- **Frank Vanihel**, ("Warden Vanihel") was the Warden of Wabash Valley during the events at issue in this lawsuit.

- **Michael Ellison** was Wabash Valley's Legal Liaison during the events at issue in this lawsuit.

**B. Mr. Carter's Medical Treatment at Wabash Valley**

6

### i.  2018–2019

On March 4, 2018, Mr. Carter submitted a Healthcare Request Form ("HCRF"), complaining about "problems with urinating, bowel mvmt. . . . prostate/colon issues." Dkt. 79-1 at 35. Mr. Carter was then scheduled with a medical provider on March 14, 2018. *Id.* at 36–38. Mr. Carter testified that the medical provider was Dr. Rajoli. *See id.* at 4–5 ¶ 3. However, the record names nonparty Dr. West-Denning as the provider. *Id.* at 38. In any case, the provider gave Mr. Carter a prostate exam and discussed managing his symptoms with exercise, diet, and topical treatment. *Id.* at 36–38. The medical provider recorded Mr. Carter's weight as 245 lbs. *Id.* at 36.

Mr. Carter submitted an HCRF on August 15, 2019, complaining about "bowel problems and bloody stools." *Id.* at 39. The HCRF noted that "this is the same issue concerning my prostate/colon that I've had for 2 years." *Id.* On August 16, Nurse Riggs conducted a sick call with Mr. Carter, where she noted that he had a colonoscopy before incarceration, that he submitted a fecal occult blood test ("FOBT"), and that he weighed 248 lbs. *Id.* at 39–42. She referred Mr. Carter to the medical provider, Dr. Rajoli, for further treatment. *Id.* at 42. During the assessment on August 22, Dr. Rajoli noted in "History of Present Illness":

> Bowel symptoms with positive fit test . . . 53 yr old male inmate patient presents to the clinic today reporting of abdominal cramping and stool mixed with blood and at times coated with blood. He states he had colonoscopy in 2012 in St. Vincent's hospital in Evansville, IN. He is otherwise denying any fevers, chills, nausea or vomiting. He denies any diarrhea and notes if at all he has constipation at times.

Dkt. 79-1 at 43. Regarding the "irritable colon" issue, Dr. Rajoli's provider plan stated: "Culturelle daily, check CBC and CMP, await records from his previous colonoscopy, await lab results to decide further course of action." *Id.* at 44 (commas added for readability).

After continuing to experience rectal pain and bleeding, Mr. Carter submitted an HCRF reporting his symptoms and requesting a colonoscopy on December 22. *Id.* at 46. On December

24, Mr. Carter saw a nonparty nurse who contacted the on-call medical provider about his symptoms. *Id.* at 49. The on-call physician advised the nurse to provide Mr. Carter with a fecal immunochemical test ("FIT") to analyze stool for hidden blood. The doctor stated, "[i]f the FIT results negative and labs stable, he does not need a colonoscopy which is what offender is wanted as he is very worried about s/s worsening." *Id.* at 49 (as written). Results for each of three stool samples returned negative. Dkt. 61-2 at 4. Mr. Carter's medical records indicate that on December 31, a nurse reviewed the negative results with him. *Id.*

### ii. 2020

Mr. Carter submitted an HCRF on January 28, 2020, complaining about "stomach pain" and asking about his lab results. Dkt. 79-1 at 50. On February 6, Dr. Byrd saw Mr. Carter for a "Chronic Care Visit," to address unrelated issues. *Id.* at 51. Dr. Byrd ordered more blood labs, but no other treatment. *Id.* at 50–54. On July 20, a nonparty nurse reviewed Mr. Carter's FOBT results, all of which came back negative for blood in his stool. Dkt. 61-2 at 5; *see* dkt. 61-5 ¶ 6. On July 31, 2020, a nonparty nurse practitioner saw Mr. Carter for his "Chronic Care Visit," to assess unrelated issues. Dkt. 79-1 at 56–57.

### iii. 2021

In June of 2021, Mr. Carter complained about bloody stool and pain again during a nurse visit. The nonparty nurse reported that she did not see any black or bloody stools or open lesions, but she gave Mr. Carter another stool test. Dkt. 61-3 at 2. She noted that his weight was 230. *Id.* at 1.

On July 8, Mr. Carter saw Dr. Rajoli for an unrelated issue. Dkt. 61-5 ¶ 10; dkt. 61-3 at 4. Dr. Rajoli noted that Mr. Carter's weight was 225. *Id.* Later that day, Mr. Carter filed an HCRF complaining about bloody stool and losing 30 pounds in four months. Dkt. 61-4 at 2. A nonparty

nurse received the HCRF the following day. Dkt. 61-5, ¶ 12. Having seen that Mr. Carter visited with Dr. Rajoli on the same date as the HCRF, the nurse assumed the issue had been addressed and responded that Mr. Carter had already been seen by the medical provider. *Id*.

Mr. Carter submitted another HCRF on July 12 referencing his July 8 request. Dkt. 61-4 at 3. In his July 12 HCRF, Mr. Carter reported he "had blood in stool and constant pain in buttocks." *Id*. He requested a PSA screen for his prostate issues and a colonoscopy. *Id*. The nurse conducted a visit with Mr. Carter on July 14 and referred him for further treatment with a physician. Dkt. 79-1 at 58–59. She also noted that Mr. Carter was "demanding" a colonoscopy and claiming that his right to medical care was being denied. *Id*. at 60. On July 16, medical staff received Mr. Carter's FOBT results, all of which tested negative for hidden blood in his stool. Dkt. 61-3 at 10.

Dr. Rajoli assessed Mr. Carter on July 22. Dkt. 79-1 at 61–64. Prior to the visit, Dr. Rajoli testified that he reviewed the results of Mr. Carter's 2012 colonoscopy, his negative FOBT results, and the results of his latest lab work, which showed normal hemoglobin and hematocrit levels in his blood. Dkt. 61-5 ¶¶ 16–18. He interpreted the normal levels of hemoglobin and hematocrit as suggesting the absence of internal bleeding and other gastrointestinal issues. *Id*., ¶ 16. Dr. Rajoli also confirmed that Mr. Carter presented at 228 pounds and had consistently weighed in at about 225 pounds over the most recent three months. *Id*., ¶ 17. Thus, Dr. Rajoli testified that, based on Mr. Carter's previous colonoscopy results, his negative FOBT results, his consistent weight, and his normal hemoglobin and hematocrit levels, he determined that an invasive colonoscopy would have very little, if any, clinical value. *Id*., ¶ 18. Dr. Rajoli reasoned that the risks of a colonoscopy, such as internal tearing and bleeding, outweighed the benefits. *Id*.

On September 23, Mr. Carter saw Nurse Riggs for a sick call where he reported a growth in his rectum despite using the suppositories that she previously gave him. Dkt. 79-1 at 64–66.

Nurse Riggs referred Mr. Carter for a physician appointment with Dr. Rajoli, who met with him on September 29. *Id.* at 65–69. Mr. Carter reported rectal pain lasting at least two weeks and stated that the suppositories did not provide any relief. *Id.* at 67; dkt. 61-5 ¶ 25. During this visit, Dr. Rajoli observed three hemorrhoids. *Id.* He ordered a Sitz Bath with Epson salt and dibucaine topical application. *Id.,* ¶ 26.

Dr. Rajoli testified that he did not receive any indication from Mr. Carter or anyone else that his prescribed treatment was ineffective or that Mr. Carter needed any additional treatment with respect to his hemorrhoids. *Id.*, ¶ 27.

Dr. Rajoli last saw Mr. Carter on December 17, for a chronic care visit to manage unrelated issues. Dkt. 79-1 at 70. Dr. Rajoli "advised compliance with medications for symptom control." *Id.*

### iv. 2022

On January 12, 2022, Dr. Byrd treated Mr. Carter for chronic cough and sore throat. Dkt. 61-6, ¶ 6 (Byrd Affidavit). Mr. Carter did not report any concerns regarding rectal pain or bleeding during this visit with Dr. Byrd, but he did have an active prescription for dibucaine to treat rectal pain and itching. *Id.*

On March 6, Mr. Carter submitted another HCRF complaining about "fecal/rectal leakage, resulting in significant pain," and complaining about Dr. Rajoli's course of treatment. Dkt. 79-1 at 73. He asked for "standard treatment – colonoscopy and/or internal biopsy." *Id.* A nonparty nurse attempted to conduct a sick call on March 15. Dkt. 61-6, ¶ 8. The parties dispute whether Mr. Carter refused the March 15 sick call. *See id.* On March 21, 2022, Mr. Carter submitted another HCRF complaining of stomach pain, drainage, and bloody stools. Dkt. 79-1 at 77. The nonparty nurse replied that Mr. Carter "refused on 3/15/22." *Id.*

On March 22, Mr. Carter was seen by a nonparty nurse for "bacterial infection in lungs." Dkt. 61-8 at 3–5. Mr. Carter did not mention concerns about rectal bleeding. Dkt. 61-6 ¶ 11.

On Mach 27, HSA Bedwell submitted an "Administrative Note" that Mr. Carter has a Physical Health CPCT Score of 1 and that he "Appears to be meeting physical health needs." Dkt. 79-1 at 78. Dr. Byrd explained that:

> CPCT refers to 'Case Plan Credit Time,' which is defined by IDOC as 'An earned credit time cut structure that is driven by the needs indicated in the Indiana Risk Assessment System (IRAS) and incentivized through the individual case plan to provide each individual the opportunity to earn the maximum credit time, as allowed by law.' The Physical Health CPCT Score Ms. Bedwell entered for Mr. Carter reflects Mr. Carter's ability to care for his daily physical needs without assistance. The score is not meant to suggest that a patient has no health conditions or symptoms whatsoever. Rather, it indicates that the patient is capable of caring for himself physically and seeking medical attention when necessary.

Dkt. 61-6 ¶ 38.

On May 11, Dr. Byrd saw Mr. Carter to discuss rectal bleeding. Dkt. 79-1 at 83. In the "History of Present Illness" section Dr. Byrd recorded:

> Pt with rectal bleeding and positive FOBT dating back to July of 2021. He notes bleeding to the point it soils his boxer shorts. His family history is unknown as it relates to colorectal cancer. His FOBT was negative 5/16/2022, however, he insists that he have a colonoscopy. He feels his risk of being an African American male justifies procedure despite being told by Dr. Rajoli test was unnecessary. He requests that I submit colonoscopy for someone to determine his need "that can actually authorize or deny this test." Submitting request for colonoscopy. No red flags in history outside family history being unknown as it comes to older males. I did review an old colonoscopy from September of 2012 in which he was diagnosed with hemorrhoids and informed to repeat colonoscopy in 5 yrs at that time.

Dkt. 79-1 at 83.

In the "Assessment/Plan" section, Dr. Byrd reported that the blood in stool, was "likely related to internal hemorrhoids as no red flag symptoms and FOBT negative back to 2019." *Id.* at 84. Dr. Byrd then decided to repeat labs to evaluate for blood loss and repeat the stool samples because "a drop in [blood] or positive [stool samples] would make a GI consult a must." *Id.* Dr.

Byrd testified that he reasoned that a colonoscopy was not necessary because Mr. Carter's medical history contained no red flags demonstrating clinical need for a colonoscopy. Dkt. 61-6, ¶ 16. On May 16, all three FOBT cards returned negative, indicating the absence of fecal blood, and the blood lab results lab results also returned normal. *Id.*, ¶ 17.

On July 12, Dr. Byrd saw Mr. Carter for testicular pain and rectal bleeding and noted in the "History of Present Illness,"

> Pt with rectal bleeding and positive FOBT dating back to July of 2021. He notes bleeding to the point it soils his boxer shorts. His family history is positive as it relates to colon polyps, but he is not certain if anyone has ever developed colorectal cancer. His son has a h/o ulcerative colitis. His FOBT was negative 5/16/2022, however, he insists that he have a colonoscopy. He feels his risk of being an African American male justifies procedure despite being told by Dr. Rajoli test was unnecessary. No concerning history such as unexplained weight loss, personal history of abdominal radiation, adenopathy, or night sweats. He does report pelvic pain described as radiating into testicles. He also notes stool incontinence described as stool oozing into his shorts. He did have a colonoscopy on 9/13/2012 prior to incarceration (see attachment). He was diagnosed with internal hemorrhoids w/ friability at that time. It was recommended he have a repeat colonoscopy in 5 yrs at that time. He believes this is long over due as it has been 10 yrs. He is requesting referral to GI.

Dkt. 79-1 at 90. In the "Assessment/Plan" section, Dr. Byrd noted: "I still believe this is likely secondary to internal hemorrhoids. He feels o/w. He notes conservative measures for hemorrhoids and constipation failed to change his symptoms. GI consult given documentation of colonoscopy recommended in 5 yrs. Dating back to 2012." *Id.* at 91.

Dr. Byrd prescribed a new topical cream and then requested approval to refer Mr. Carter for an offsite consultation with a gastrointestinal specialist. Dkt. 61-6 ¶¶ 19–20. Dr. Byrd's request for gastroenterology was later approved and scheduled for August 22. Dkt. 79-1 at 94–100. Dr. Byrd reported that the offsite gastroenterologist recommended lab tests and a colonoscopy "given it has been 10 years since last colonoscopy and family h/o colon cancer (grandfather) as well as ulcerative colitis (son in his 30s)." *Id.* at 106. On August 24, Dr. Byrd submitted a request for a

colonoscopy and lab work to Centurion. *Id.* at 108. An email between nonparties shows that "IndianaUMReferrals" asked for the offsite request to be resubmitted so that they would have time to review it. *Id.* at 109.

Mr. Carter testified that Nurse Riggs delayed re-submitting the consult request for 30 days. Dkt. 79 at 9. Dr. Byrd, however, testified that after Centurion did not respond to the request, he asked Nurse Riggs to resubmit the request on September 20, 2022. Dkt. 61-6 ¶ 25; *see* dkt. 79-1 at 111. Centurion approved the request on September 23 and Dr. Byrd scheduled an appointment with offsite provider Dr. Heppner for October 19, 2022. Dkt. 61-6 ¶ 25. The colonoscopy confirmed that Mr. Carter had both internal and external hemorrhoids. Dkt. 79-1 at 116–120. Dr. Heppner discharged Mr. Carter following the colonoscopy with advice to resume his diet, continue medications as prescribed, avoid straining during bowel movements, and to consult with a surgeon if bleeding continued. *Id.* at 117. Dr. Heppner recommended a follow-up colonoscopy in 10 years. *Id*.

Mr. Carter met with nurse practitioner Kalya Kellams on October 26 to go over the colonoscopy results. Dkt. 61-6 ¶ 27. Based on Mr. Carter's report of intense pain and the ineffectiveness of conservative measures, NP Kellams submitted a request to approve an offsite surgical consultation to remove the internal hemorrhoids. *Id.*, ¶ 28.

On December 6, Mr. Carter met with a surgeon offsite, who recommended a hemorrhoidectomy after explaining the risks associated with the surgery. Dkt. 79-1 at 128. Dr. Byrd conducted a follow up visit on December 14, where he noted:

> Pt seen in MDSC for 7 day follow up: This offender had outside appointment and this is his 7 day follow up from that trip. He is a/o, vss, afebrile. Denies chest pain or SOB. No constitutional complaints. Discussed the particulars of his outside consult and plan to follow recommendations. Recommendations as follows -- Hemorrhoidectomy recommended if conservative measures have failed. Mr. Carter has failed multiple measures, so we'll request surgery."

13

*Id.* at 129. Centurion approved the surgery and Mr. Carter underwent the hemorrhoidectomy on February 13, 2023. *Id.* at 135.

### C. Mr. Carter's Grievances

Mr. Carter complained about the medical treatment for his hemorrhoids on several occasions. On March 6, 2021, Mr. Carter submitted a HCRF complaining about the delay in medical care. HSA Bedwell replied in a handwritten note, "[i]f you are having medical issues, put in a HCRF to be seen." *Id.* at 73–74.

On September 29, 2021, Mr. Carter submitted a formal grievance complaining that "Dr. Rajoli did not address my serious medical need. I was humiliated and embarrassed by the lack of professional care and Dr. Rajoli's unconcern for my medical condition, which is accompanied by constant pain and bleeding." *Id.* at 8. Mr. Carter requested "to be seen by a specialist at a local hospital." *Id.* Mr. Carter received a response from HSA Hobson on October 6, saying "the provider addressed your complaint of rectal pain" and to "continue to follow the provider's plan of care at this time." *Id.* at 9–11. On October 21, a nonparty grievance specialist returned HSA Hobson's response to Mr. Carter and added that he should "submit an HCRF if his symptoms did not improve." *Id.* at 11. Mr. Carter appealed, complaining that Dr. Rajoli's treatment was ineffective and that it did nothing to address the bleeding internal growth. *Id.* at 13. On November 15, Defendant Michael Ellis, denied the appeal and stated, "[t]here are internal and external hemorrhoids, when you receive your medical degree, you can then dispute what Dr. Rajoli has prescribed." *Id.* at 13. The final reviewing authority later denied Mr. Carter's appeal. Dkt. 64-1 at 1, 4.

On March 20, 2022, Mr. Carter filed another formal grievance, stating: "[f]or an anguishing five years I have had to suffer anal bleeding and intense stomach pain . . . All treatment thus far

14

has failed. The above-mentioned condition is persistent and has worsen[ed]. . . " Dkt. 79-1 at 15. The grievance claims that the "incident" occurred on March 17. *Id.* Ms. Crichfield responded on March 22, 2022, rejecting the grievance because of its untimeliness and telling Mr. Carter to "submit a HCRF to be seen." *Id.* at 16. Mr. Carter appealed, saying that the grievance clearly shows that the incident occurred on March 17, which is less than the IDOC's deadline of 10 days before he filed the grievance on March 20. *Id.* at 17. Ms. Crichfield replied, "you have had plenty of time in 5 yrs to grieve decision stands." *Id.* (as written).

A week later, on March 28, Mr. Carter filed a formal grievance complaining that his HCRF was returned to him because the nurse stated that he "refused" a clinic visit on March 15. Dkt. 64-5 at 3. He claimed, "[t]his is the HCRF that I was told to fill out by grievance specialist Crichfield and Ms. Bedwell, if I was still having health problems. I turned it in and the nurse or whomever . . . was not telling the truth about me refusing treatment." *Id.* The grievance states that Mr. Carter went to the clinic and talked to Nurse Tracy, who had not received an HCRF from him. *Id.* Mr. Carter asks to be seen by a doctor about "my ongoing medical needs pertaining to blood and drainage from my anal canal, severe pain shooting through my stomach and pain in my testicles." *Id.* at 3.

On April 4, Ms. Crichfield denied Mr. Carter's grievance, stating "[y]ou were seen on 3/22/22 after submitting your HCRF on 3/21/22. Submit a HCRF to be seen by medical." *Id.* at 5. Mr. Carter responded by explaining how submitting HCRFs was futile. *Id.* at 5. Ms. Crichfield then forwarded Mr. Carter's grievance and appeal to HSA Bedwell on April 12 and asked for a response. *Id.* at 6. HSA Bedwell responded, "[r]ecords show you were seen on 3-22-22 by nursing sick call for lung issues . . . the visit prior on 3-15-22 says you refused and this visit was in regards to rectal issues. . . I will request you be seen in nursing sick call." *Id.* at 9. Mr. Carter appealed,

once again reiterating that he had submitted dozens of HCRFs and had yet to see any relief. *Id.* at 25–26. Mr. Carter's appeals were denied. *Id.* at 10–12.

On April 6, Mr. Carter submitted a "Request for Interview" to Warden Vanihel, stating, "I filed a grievance on Wed. March 30, 2022 concerning medical staff's refusal to see me and referral to doctor for serious medical issues I'm having. Grievance officer has not sent me a receipt nor is he/she going because I implicated him/her in my grievance." Dkt. 79-1 at 82. Someone responded on April 8, "Per Bedwell from your EMR, you were seen on 3/22/22 for this exact complaint." *Id.*

Overall, Mr. Carter did not have any direct communication with Warden Vanihel. Dkt. 64-1 at 56 (Carter Dep.). He also did not have any face-to-face communication with Mr. Ellis or Ms. Crichfield. *Id.* at 57–64. Grievance specialists do not make any medical decisions. *Id.* at 63.

## IV.
## The IDOC Defendants

The IDOC Defendants argue that Mr. Carter's Eighth Amendment claim fails as a matter of law because they were not personally involved in his medical treatment. Furthermore, as nonmedical staff, they properly deferred to the Medical Defendants' professional judgment. Dkt. 65. Mr. Carter responds that all three IDOC Defendants knew about the seriousness of his medical condition and failed to respond. Dkt. 79 at 22–24.

### A. Personal Involvement

"'To recover damages under § 1983, a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right.'" *Whitfield v. Spiller*, 76 F.4th 698, 706 (7th Cir. 2023) (quoting *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)). Even if a defendant does not personally cause a constitutional violation, that defendant is liable when he or she "knows about unconstitutional conduct and facilitates, approves, condones, or turns a blind eye to it." *Perez v. Fenoglio*, 792 F.3d 768, 781 (7th Cir. 2015) (internal citations and quotations

16

omitted). In general, prison officials who simply processed or reviewed inmate grievances lack personal involvement in the conduct forming the basis of the grievance. *Owens v. Evans,* 878 F.3d 559, 563 (7th Cir. 2017) (citing *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001)). Furthermore, "inaction following receipt of a complaint about someone else's conduct is" insufficient under § 1983. *Est. of Miller by Chassie v. Marberry*, 847 F. 3d 425, 428–29 (7th Cir. 2017) (affirming summary judgment in favor of the defendants when the plaintiff alleged that they "brushed off his complaints, leaving them to be handled through the chain of command").

Nevertheless, "[a]n inmate's correspondence to a prison official may thus establish a basis for personal liability under § 1983 where that correspondence provides sufficient knowledge of a constitutional deprivation." *Perez*, 792 F.3d at 781-82. "[O]nce an official is alerted to an excessive risk to inmate safety or health through [an inmate's] correspondence, refusal or declination to exercise the authority of his or her office may reflect deliberate disregard." *Id.* at 782 (finding that prison officials may be personally liable where plaintiff submitted "coherent and highly detailed grievances and other correspondences" showing that he did not receive treatment for serious hand injuries).

Here, a reasonable jury could not find that Warden Vanihel was personally involved in delaying Mr. Carter's treatment. The record does not show that Warden Vanihel knew about the alleged constitutional deprivation and then turned a blind eye or condoned it. There is no evidence that Warden Vanihel communicated with Mr. Carter about his medical treatment or that he saw or handled any of Mr. Carter's HCRFs or grievances. Because there is no basis for personal liability, the Court **GRANTS** summary judgment for Warden Vanihel.

Because Ms. Crichfield and Mr. Ellis received and answered Mr. Carter's coherent and detailed grievances, the record shows that were "alerted" to a potential risk to Mr. Carter's health

and safety. *See id.* Thus, the Court does not grant summary judgment on the basis of their lack of personal involvement.

### B.  The Eighth Amendment

The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

The parties do not dispute that Mr. Carter's health condition was objectively serious. To avoid summary judgment, then, the record must allow a reasonable jury to conclude that the IDOC Defendants acted with deliberate indifference—that is, that they "consciously disregarded a serious risk to [Mr. Carter's]'s health." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021) (cleaned up). Deliberate indifference requires more than negligence or even objective recklessness. *Id.* Rather, Mr. Carter "must provide evidence that an official actually knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016).

The "division of labor within a prison necessitates that non-medical officials may reasonably defer to the judgment of medical professionals regarding inmate treatment." *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019). "If a prisoner is under the care of medical experts .

18

. . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands . . . absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *Id.* (internal quotations omitted). The exception thus arises when a non-medical staff member condones medical staff's refusal to provide care or impedes access to medical care. *See Arnett v. Webster*, 658 F.3d 742, 756 (7th Cir. 2011).

Here, a reasonable jury could not find that Ms. Crichfield displayed deliberate indifference by ignoring, delaying, or impeding Mr. Carter's treatment. Ms. Crichfield processed two grievances about Mr. Carter's medical care. Ms. Crichfield rejected the March 20 grievance as untimely. The Seventh Circuit has held, however, that this exact action does not display deliberate indifference. *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) (holding that grievance processor was not deliberately indifferent to plaintiff's medical needs when she rejected his grievance as untimely). Mr. Carter disputes that the grievance was untimely. However, even though Mr. Carter wrote that the "incident" occurred on March 17, the grievance's content is ambiguous because it complains about suffering for "five years" and states that Mr. Carter "recently wrote to HSA Bedwell and [Nurse] Riggs." *See* dkt. 79-1 at 15. Thus, the content does not clearly show when the complained about incident occurred within the 10-day time frame. But, Ms. Crichfield responded to Mr. Carter's assertion of timeliness that "you have had plenty of time in 5 yrs to grieve decision stands." She clearly based her decision on the 5-year time frame. Moreover, assuming that Ms. Crichfield wrongly determined that the grievance was untimely, mishandling grievances "by persons who otherwise did not cause or participate in the underlying conduct states no claim" for a constitutional violation. *Owens*, 635 F.3d at 953. Without more, the Court cannot infer and a reasonable jury could not find from Ms. Crichfield's rejection of the

grievance that she intentionally mishandled it to get in the way of Mr. Carter's treatment. She also told Mr. Carter to "submit a HCRF to be seen."

In response to Mr. Carter's March 28 grievance, Ms. Crichfield processed the grievance and confirmed that Mr. Carter was seen by the medical provider on March 22. When Mr. Carter responded that submitting HCRFs was futile, she forwarded the grievance and appeal to HSA Bedwell, who confirmed that Mr. Carter was seen for lung issues on March 22 and that she would request a nursing sick call. After that, Mr. Carter appealed to a higher authority. In this way, Ms. Crichfield processed the grievances, reached out to medical staff to ensure that Mr. Carter had received treatment, and then forwarded HSA Bedwell's response to Mr. Carter. A jury could not conclude that Ms. Crichfield's actions show deliberate indifference. *Greeno v. Daley*, 414 F.3d 645, 656 (7th Cir. 2005) ("Perhaps it would be a different matter if [the nonmedical defendant] had ignored Greeno's complaints entirely, but we can see no deliberate indifference given that he investigated the complaints and referred them to the medical providers who could be expected to address Greeno's concerns."). Furthermore, after deferring to medical, Ms. Crichfield did not receive notice that medical staff failed to treat Mr. Carter. *Hayes v. Snyder*, 546 F.3d 516, 525 (7th Cir. 2008).

A reasonable jury could not find that Mr. Ellis displayed deliberate indifference for the same reasons. Mr. Ellis received Mr. Carter's appeal from his October 2021 grievance, reviewed the records, and determined that Mr. Carter was appropriately under Dr. Rajoli's care. The fact that Mr. Carter disagreed with Dr. Rajoli's treatment would not provide Mr. Ellis with actual knowledge that prison doctors were mistreating Mr. Carter. *See id.* Furthermore, the record does not show that Mr. Ellis received any additional notice about the delays in Mr. Carter's treatment.

Thus, the Court **GRANTS** summary judgment for Ms. Crichfield and Mr. Ellis.

## V.
## The Medical Defendants

The Medical Defendants argue that Mr. Carter's claim fails because (1) there is no evidence supporting a *Monell* claim against Wexford, and (2) there is no evidence that the individual Medical Defendants were deliberately indifferent to Mr. Carter's medical needs. Dkt. 62. Mr. Carter generally responds that the Medical Defendants wrongfully persisted with a course of treatment that they knew was ineffective until the ACLU intervened by contacting the IDOC. Dkt. 79.

### A. *Monell* Claims

Private corporations acting under color of state law, such as Wexford, are treated as municipalities for purposes of § 1983 and can be sued when their actions violate the Constitution. *Dean*, 18 F.4th at 235 (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)). To state a § 1983 claim against a municipality, a plaintiff must allege that the municipality, "either through an express policy or an implied policy of inaction, took 'deliberate' action that was the 'moving force' behind a constitutional injury." *Taylor v. Hughes*, 26 F. 4th 419, 435 (7th Cir. 2022) (quoting *Bd. Of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 403–407 (1997)). Here, Mr. Carter has not designated any evidence showing that Wexford had a policy or practice that violated his rights. Mr. Carter claims that Wexford "caused an eight month delay before the Plaintiff finally received the surgery." Dkt. 79 at 15. The record does not support this claim, however, at least because Wexford's healthcare services contract with the IDOC ended in June of 2021 and Mr. Carter was not referred to a surgeon until 2022. Moreover, Mr. Carter has not shown that Wexford's policies from 2018 to 2021 caused the delay in treatment. For this reason, the Court **GRANTS** summary judgment for Wexford.

### B. The Eighth Amendment

As seen above, to avoid summary judgment, the record must allow a reasonable jury to conclude that the individual Medical Defendants acted with deliberate indifference—that is, that they "consciously disregarded a serious risk to [Mr. Carter's]'s health." *Dean*, 18 F.4th at 241. Because medical professionals rarely admit that they consciously disregarded a prisoner's serious medical condition, "deliberate indifference must be inferred from the propriety of their actions." *Id.* (internal citations omitted).

The Seventh Circuit has held that deliberate indifference occurs when the defendant:

- renders a treatment decision that departs so substantially "'from accepted professional judgment, practice, or standards as to demonstrate that'" it is not based on judgment at all. *Petties*, 836 F.3d at 729 (quoting *Cole v. Fromm*, 94 F.3d 254, 260 (7th Cir. 1996)).

- refuses "to take instructions from a specialist." *Id.*

- persists "in a course of treatment known to be ineffective." *Id.* at 729–30.

- chooses "an 'easier and less efficacious treatment' without exercising professional judgment." *Id.* at 730 (quoting *Estelle*, 429 U.S. at 104 n.10).

- effects "an inexplicable delay in treatment which serves no penological interest." *Id.*

Just as nonmedical defendants are entitled to rely on the judgment of medical professionals, "[a]s a general matter, a nurse can, and indeed must, defer to a treating physician's instructions." *Reck v. Wexford Health Sources*, *Inc.*, 27 F.4th 473, 485 (7th Cir. 2022). But she still maintains "an independent duty to ensure that inmates receive constitutionally adequate care." *Perez v. Fenoglio*, 792 F.3d 768, 779 (7th Cir. 2015).

### i.  HSA Hobson

A reasonable jury could not find that HSA Hobson acted with deliberate indifference. The record here shows that, on October 6, 2021, HSA Hobson fulfilled her administrative duties in her response to Mr. Carter's September 29 complaint about Dr. Rajoli. After reviewing the record, she

wrote "the provider addressed your complaint of rectal pain" and to "continue to follow the provider's plan of care at this time." Dkt. 79-1 at 9–11. After that, the record does not show that HSA Hobson had any notice that Dr. Rajoli's treatment did not work. Similar to Ms. Crichfield and Mr. Ellis, when HSA Hobson received a complaint, she followed up and responded after seeing that a medical provider had attended to Mr. Carter. Mr. Carter has not shown that HSA Hobson had reason to question whether the prescribed treatment was appropriate. Moreover, HSA Hobson held an administrative position and there is no evidence that she had the power to intervene in Dr. Rajoli's course of treatment or review his decisions. Thus, the record simply does not show that HSA Hobson displayed deliberate indifference by interfering in Mr. Carter's treatment or unreasonably delayed his treatment. *See Hill v. Meyer*, 2022 WL 1078871, at *4 (7th Cir. Apr. 11, 2022) (summary judgment for Health Services Administrator was appropriate where plaintiff did not produce evidence that she had the authority to order specific care or reason to question the adequacy of the care the plaintiff was receiving). Therefore, the Court **GRANTS** summary judgment for HSA Hobson.

### ii.  HSA Bedwell

Similar to HSA Hobson, HSA Bedwell fulfilled her administrative duties by responding to Mr. Carter's complaints. Indeed, after noting that Mr. Carter was not seen for his hemorrhoid issues during the March 22, 2022, appointment, she responded to his grievance by noting that she would reach out to the nurse to schedule a sick call. Mr. Carter was then seen by Dr. Byrd on May 11, 2022. Mr. Carter argues that HSA Bedwell "distort[ed] [] the truth" when she noted that he "appears to be meeting physical health needs" in her March 27, 2022, entry. Dkt. 79 at 13. However, Dr. Byrd testified that this entry was unrelated to Mr. Carter's hemorrhoid issues. Instead, the entry related to Mr. Carter's CPCT score, which reflects Mr. Carter's ability to care for

his daily physical needs without assistance. *See* dkt. 61-6. In sum, the record would not allow a jury to infer that HSA Bedwell displayed deliberate indifference by interfering in Mr. Carter's treatment or unreasonably delayed it. Therefore, the Court **GRANTS** summary judgment for HSA Bedwell.

### iii. Nurse Riggs

Nurse Riggs treated Mr. Carter twice—in August of 2019 and in September of 2021. Each time, she assessed Mr. Carter and then referred him to Dr. Rajoli for further treatment. In this way, she deferred to the physicians' treating instructions. See *Reck*, 27 F.4th at 485. Though Nurse Riggs has an independent duty to ensure that Mr. Carter received constitutionally adequate care, *see Perez*, 792 F.3d at 779, after scheduling Mr. Carter with Dr. Rajoli, the record does not show that she received notice that Mr. Carter was receiving inadequate medical care.

Mr. Carter argues that Nurse Riggs persisted in inadequate treatment by prescribing suppositories for constipation during one of the visits. However, "[i]t is not enough that the plaintiff simply believes the treatment was ineffective or disagrees with the doctor's chosen course of treatment." *Thomas*, 991 F.3d at 772. Instead, a defendant displays deliberate indifference "'only if the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, no minimally competent professional would have so responded under those circumstances.'" *Petties*, 836 F.3d at 728–29 (quoting *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 989 (7th Cir. 1998)). Here, prescribing suppositories for constipation does not show a lack of judgment or minimal competence without evidence showing that Nurse Riggs persisted in this course of treatment.

Mr. Carter also argues that Nurse Riggs interfered in scheduling his colonoscopy, but he does not cite any evidence from the record that supports this fact. Furthermore, Dr. Byrd testified

that Centurion did not respond to his initial request, so he asked Nurse Riggs to resubmit it. The email also does not show intentional delay since it merely directs the defendants to resubmit the request so that they would have more 1time to review it. *See* dkt. 79-1 at 109. As the nonmoving party, Mr. Carter receives "the benefit of conflicting evidence and reasonable inferences." *Stockton v. Milwaukee County*, 44 F.4th 605, 614 (7th Cir. 2022). That said, he must "produce evidence sufficient to establish [the] element[s] essential to" his claim. *Id.* Absent evidence, Mr. Carter's claim does not create a dispute of fact as to whether Nurse Riggs delayed the request to refer him to an offsite provider.

As such, a reasonable jury could not conclude that Nurse Riggs was deliberately indifferent to Mr. Carter and the Court **GRANTS** summary judgment for her.

### iv.  Dr. Rajoli

A reasonable jury could find that Dr. Rajoli displayed deliberate indifference towards Mr. Carter's serious medical needs. "[A]n inmate is not required to show that he was literally ignored by prison staff to demonstrate deliberate indifference . . .  If a risk from a particular course of medical treatment (or lack thereof) is obvious enough, a factfinder can infer that a prison official knew about it and disregarded it. *Petties*, 836 F.3d at 729 (internal citations omitted). A factfinder could infer deliberate indifference in this situation where "a prison official persists in a course of treatment known to be ineffective." *Id.* For example, in *Greeno,* the court held that the medical professionals' decision to continue to treat severe vomiting with antacids and their refusal to refer plaintiff to a specialist for over three years created a material fact issue of deliberate indifference. 414 F.3d at 654. Here, the record shows that Dr. Rajoli first treated Mr. Carter for bleeding and pain associated with hemorrhoids in 2019 where he noted that he would request the records from Mr. Carter's 2012 colonoscopy and await test results. Then, in July and September of 2021, Dr.

Rajoli treated the same symptoms of intense pain and bloody stool associated with hemorrhoids. Prior to the July 2021 visit, Dr. Rajoli viewed Mr. Carter's records and saw that the previous physician recommended performing a colonoscopy in five years and banding if the symptoms persisted. Even though lab tests in 2021 did not reveal objective evidence of bloody stool or blood loss, "there is no requirement that a prisoner provide 'objective' evidence of his pain and suffering—self-reporting is often the only indicator a doctor has of a patient's condition." *Id.* at 655 (internal citation omitted). A reasonable jury could find that Dr. Rajoli persisted in a course of conservative treatment for hemorrhoids despite Mr. Carter's continued subjective complaints about the same symptoms and despite recommendations from another physician.

The Medical Defendants rightly argue that prison officials do not necessarily violate the Eighth Amendment by refusing to send an inmate to a specialist. Dkt. 82 at 5 (citing *Pyles v. Fahim,* 771 F.3d 403, 411 (7th Cir. 2014)). Furthermore, as seen above, an inmate's "'disagreement with a doctor's medical judgment is not deliberate indifference.'" *Id.* (quoting *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007). The *Pyles* court noted, however, that when "the need for specialized expertise either was known by the treating physicians or would have been obvious to a lay person, then the obdurate refusal to engage specialists permits an inference that a medical provider was deliberately indifferent to the inmate's condition." 771 F.3d at 412. For example, in *Pyles*, the physician's refusal did not warrant an inference of deliberate indifference because the plaintiff had a common ailment—backpain—and there was no evidence in the record that his backpain warranted specialized treatment. *Id.* In contrast, in *Greeno*, summary judgment was inappropriate when the prisoner suffered from severe intestinal distress over three years, and was ultimately diagnosed by a specialist as having an esophageal ulcer. 414 F.3d at 648–51. The court concluded that the record would allow the jury to find for the prisoner because the possibility of

an ulcer had been noted in the prisoner's medical file two years before the diagnosis, and the prisoner had been made to suffer in the meantime. *Id.* at 655. In this case, a jury could similarly find that Dr. Rajoli knew about the possibility of internal hemorrhoids over the course of two years and still refused to send Mr. Carter to a specialist who could properly diagnose and treat the hemorrhoids.

### v.  Dr. Byrd

A reasonable jury could find that Dr. Byrd impermissibly delayed Mr. Carter's treatment for the same reasons outlined for Dr. Rajoli. *See Thomas v. Martija*, 991 F.3d 763, 772 (7th Cir. 2021) ("Persisting in treatment known to be ineffective can constitute deliberate medical indifference, provided that the doctor was subjectively aware that the treatment plan was ineffective."). Though Dr. Byrd *did* refer Mr. Carter to a specialist and then referred him for surgery, he waited until the second appointment in July of 2022 to do so. This is after presumably seeing Mr. Carter's medical records from his 2012 colonoscopy, his visits with Dr. Rajoli, and hearing his complaints about increasing pain and bleeding for the past four years. As stated above, "self-reporting is often the only indicator a doctor has of a patient's condition" and a lack of objective evidence does not defeat an inference of deliberate indifference. *Greeno,* 414 F.3d at 655. Thus, a jury could find that Dr. Byrd displayed deliberate indifference by not referring Mr. Carter to a specialist sooner. *See, e.g., Goodloe v. Sood*, 947 F.3d 1026, 1032 (7th Cir. 2020) (summary judgment inappropriate when physician decided that plaintiff needed to see a specialist, but then delayed the referral despite plaintiff's continuing complaints).

### IV.
### Conclusion

The Court **GRANTS** the Defendants' motion to strike the surreply, dkts. [88], [91]. The **clerk is directed** to strike the surreply at Docket No. [87].

The IDOC Defendants' motion for summary judgment, dkt. [64], is **GRANTED.** The **clerk is directed** to terminate Shelby Crichfield, Frank Vanihel, and Michael Ellis as defendants on the docket. Partial final judgment will not issue at this time.

The Medical Defendants' joint motion for summary judgment, dkt. [60], is **GRANTED** as to Wexford, Sara Bedwell, Kimberly Hobson, and Barbara Riggs, and **DENIED** as to Dr. Naveen Rajoli and Dr. Samuel Byrd. The **clerk is directed** to terminate Wexford, Sara Bedwell, Kimberly Hobson, and Barbara Riggs, as defendants on the docket.

Mr. Carter's Eighth Amendment claims against Dr. Rajoli and Dr. Byrd are proceeding in this case. The Court prefers that Mr. Carter be represented by counsel for the remainder of this action. The **clerk is directed** to send Mr. Carter a motion for assistance recruiting counsel with his copy of this Order. Mr. Carter has **28 days** from the date of this Order to file a motion for counsel using this form motion or to inform the Court that he wishes to proceed pro se. Once the motion has been ruled on and counsel has been recruited, the magistrate judge is asked to schedule a telephonic status conference to discuss further proceedings.

**IT IS SO ORDERED.**

Date:    12/31/2025

JAMES R. SWEENEY II, CHIEF JUDGE
United States District Court
Southern District of Indiana

Distribution:

DARRELL DEWAYNE CARTER
957040
WABASH VALLEY - CF
Wabash Valley Correctional Facility
Electronic Service Participant – Court Only

All ECF-Registered Attorneys of Record